This is a question respecting an entry and the manner it should be surveyed. Craig's entry calls to adjoin Tatom's, which it is insisted is vague, undefined, and void, and therefore Craig's must be so too. The entry of Tatom is in these words: "Absalom Tatom enters 5000 acres of land, lying on the south side of Big Harpeth River, on the fork called Daniel's fork, it being the second creek to the westward from where the commissioners began the line, *Page 290 
near the glades of Harpeth, and about eight or ten miles west of the said beginning, which said line is the southern boundary of Davidson county; beginning west of the ten-mile tree, and extending north and south and east for quantity." Agreeing with the other member of the Court, in the opinion already delivered, it is unnecessary to go over the whole ground. The stress of the argument, on the part of the appellant, will only be adverted to. The position taken is, that "in surveying Tatom's entry it should have been run equal distances, north and south, from the place of beginning." Had this been the case, and Craig adjoined agreeably to the calls of his entry, the plaintiff's claim would not have been interfered with. Without confining Tatom to this mode of surveying, it has been insisted that his entry would be vague, and that no subsequent enterer could make an entry in the neighborhood with safety. Here the doctrine of certainty in entries again occurs, and will be noticed to a certain extent, with a view to the examination of some grounds hitherto not particularly explored. The great and important principle to be attended to in questions of this kind, is "that the parties each claim under the statutes relating to land titles. Every one who claims under a statute must bring himself within its provisions, and courts in their decisions will be governed by those statutes." Hardin, 472, Speed v. Lewis. The inquiry then is, What is the meaning of our statutes, in relation to this certainty, of which so much has been said? On this particular point, as to a generic definition of this certainty, the statutes are silent.
Practice or usage under these laws for thirty-seven years, if uniform, is the safest criterion to which resort can be had. In this case, the maxim "communis error facit jus" applies with insurmountable force, supposing the opinions of courts, proprietors, surveyors, and citizens to have been heretofore wrong, which is by no means admitted.
The reasoning powers of men, we know, differ, as much as their faces. Sometimes different premises are assumed; at others, different deductions are drawn from the same premises. With some, the result of a process of reasoning is believed to be a fair inference from the premises taken, and consonant to the natural order and fitness of things. Whilst others believe they see with equal clearness the process distorted, the result absurd and inconvenient. The truth is we are all imperfect beings; imperfection is the lot of humanity; and, in this sublunary state of existence, the views of the wisest head are but limited and indistinct. Ours is but the twilight of knowledge, and he who has the strongest *Page 291 
mental eye has, by any method of reasoning he may adopt, only a little better chance of seeing matters as they really are disposed by the Supreme Arbiter of all things. Laws were made for the better government of societies; particularly for the convenience and happiness of the community on whom they were intended to operate. Where laws are not local in their nature, operate indiscriminately on the individuals of whom such society is composed, and where civil rights are continually and extensively growing out of them, and men have, for a considerable time immediately succeeding the introduction of those laws, thought and acted alike in relation to them, we may safely adopt the general sense of those concerned, as the most unexceptionable ground of decision. In this we cannot err. Individuals may mistake in selecting their means of happiness, and in their process of reasoning; but societies are rarely found to have settled down in principles unappropriate to their situation. Admitting, however, it were otherwise, according to the light obtained by the utmost force of reason applied to the subject, how must the Court act? Wrapped in self-conviction of the impropriety of the construction put on laws, half a century or perhaps a century ago, by persons who were at the making of them, and interested in knowing their meaning, shall a court now say that the contemporaneous interpretation of these laws was wrong, and that it will put things to rights? The science of law is without the means of conveying an adequate idea of the mischiefs arising from such a course. But its reverse has been sanctioned by the adoption of the maxim, "communiserror facit jus." If statutes have been passed, innumerable rights have taken root in a practical interpretation of those laws, and it is not fit, whatever we may think of the errors of our predecessors, to examine the subject at all with a design to correct those errors by applying a different rule. This method would unsettle every thing, and, if applied in all cases, we should soon have no law at all. Decisions on the same point would differ as often as there might happen to be different judges in the courts; nay, it is by no means improbable that the same judge, through inattention or forgetfulness, might decide differently at different times. Between uncertainty of law and despotism, there is but little if any difference. "Wretched indeed is the condition of that people where the law is either uncertain or unknown. It is essential to private justice, and to public peace and to order, that the rules of property, as well as other subjects of society, should be settled and promulged." Per M'Kain, chief justice, 2 Dallas, 98. And *Page 292 
hence the frequent recurrence of the principle, stare decisis etnon quieta movere,[1] a maxim which results from the nature of man. *Page 293 
The further we advance in knowledge, the more sensible we are of our own weakness and limited powers; and with the greater pleasure will the mind seize those principles which have been tested by experience, in preference to the fairest and most beautiful theories. Until the time of the great Chancellor Bacon, men were enveloped in the mists and clouds of metaphysical and theoretical reasoning. He formed a new era in the character of the human mind. Instead of the process of theory in the discovery of truth, in all arts and sciences, he adopted that of experiment, which has been followed ever since, attended with prodigious results, in the increase of knowledge, particularly in the abstract sciences, where it has been undeviatingly followed. To the same process does the science of law owe its present improved state more than all others put together. The first utensil a *Page 294 
lawyer lays hold of, in order to ascertain the law arising in any case, is the concurrent opinion of judges or sages of the law who have preceded him; he applies it in preference to any reasoning of his own, because it has been proved and tested by experience; his own, independent of experience, would be mere theory, in which the experience of the wisest men in all countries and ages shows that he is continually subject to err. In the absence of evidence of this kind, as to what shall be considered a ground of interpretation, courts have adopted the general sense of society for a length of time immediately after the enactment of a law, as much more safe and infallible than theoretic reasoning, in all cases where the words of a law are not directly and flatly opposed to such construction. And even this barrier has been found broken down by long and inveterate habits. If the individuals of whom society is composed are generally satisfied with an erroneous construction of a statute, and have evinced that satisfaction by conforming their actions to it, who has a right to find fault? Surely not the courts. Legal constructions have always in view the happiness of the people. If they are content, and happy in the practical construction of any statute, the end is attained.
The laws of different states or societies differ, and what we might think wrong, or even absurd, they might be convinced by practical observation was right. In fact, it might be wrong as relating to the interests of other societies or individuals.
Applying these principles to the case before the Court, we shall find the defendant must prevail on the ground that Tatom's entry was legally surveyed. Amidst the great number of decisions, either in North Carolina or this State, it is not perceived that a single case was ever decided on the principles contended for by the appellants' counsel, except the case of Sanford's Lessee v. Anglin in the Federal Court, which will be presently noticed. This is the only case known of. I was of counsel with Sanford in that case, in which Judge Todd, in giving his opinion, observed that he had no opportunity of becoming acquainted with the course of decisions in this State. It was soon after his taking a seat in the Federal Court here. He stated what the rule of decision would be in such a case in Kentucky, but this was not the only, nor even the main, ground relied on by Sanford's counsel. Subsequently to this time, in June, 1812, the principles which had governed the State courts were recognized by the same court, as it was understood, particularly in Henderson's case. *Page 295 
The contest seems to have originated principally from a misconception of the expression "special entry," found in our Act of 1786, c. 20, for it occurs in no other act respecting land titles. It is insisted that this act intended to give a new character to entries by requiring greater precision in them than was contemplated by any of the previous statutes. A moment's examination will dissipate this error. The act is merely declaratory in this respect; this is evident from its words: "Whereas it is the intent and meaning of the said act (meaning the Act of 1783, c. 2, specified in the caption) and of the act hereby revived (1777, c. 1) and put in force, that the first enterers of the vacant and unappropriated land, if specially located, therein described, shall have preference to all others in surveying and obtaining grants for the same, when such entries shall have been specially made; and whereas divers persons have repaired to the lands lying out of the inhabited part of this State, and have caused the same to be surveyed by virtue of entries made subsequent to other entries for the same lands, and plats of such surveys to be returned to the secretary's office, have or are about to obtain grants for the same to the prejudice of the first enterers," for remedy whereof, section first provides "that every such first enterer of lands in the western part of the State, out of the inhabited parts thereof, shall have two years to make their surveys, and obtain grants; and that all grants and surveys of lands lying in the parts aforesaid, heretofore or hereafter to be made or obtained within the said two years, by any person upon lands previously or first entered by any other person, shall be, and the same are hereby, declared to be void and of no effect."
Thus, it appears that that act, besides being declaratory, was local and temporary. It expired in November, 1788, and never was revived; it made no part of the general system of land law, and therefore forms no ingredient in the consideration of what shall be such specialty as is required by the laws of North Carolina. But had the legislature meant this as a permanent regulation, what did it mean when speaking of entries specially located? Manifestly, as the language imports, entries made before that time was designed. In the numerous acts of North Carolina on the subject of land titles, the expression, special entry, had never been employed. And yet we all know there must and naturally did exist settled ideas respecting the difference between special and vague locations. Though there was no law in existence defining what should constitute a special entry, it was well understood from the year 1777, and these *Page 296 
impressions were as completely settled as any principle of law could be at the time of the passage of the Act of 1786; an immense number of titles had been acquired previous to that time; the first, most essential, and obvious principles of the land law would of course be understood and acted on. Previously to the year 1786, a vague entry was well understood to be one that contained no such specialty as that a majority of those acquainted in its neighborhood at its date could by reasonable industry find it; a special entry was considered the reverse. How natural is it, then, for us to suppose that the legislature designed, in the use of this expression, in the Act of 1786, to convey such ideas as had by usage and common consent been appropriated to it. It has shown no symptom of a disposition to convey a different idea. Nothing can be clearer than that the legislature did not design to introduce any new principle by this act; it only meant to act on the old, or those previously understood and recognized. Had the legislature designed to introduce new impressions relative to specialty in entries, it certainly would not have made them extend to entries previously made, to impair the force of rights and obligations then in existence. Such an act would have been entirely retrospective, and opposed to the genius of our government and laws. There being no language authorizing such an interpretation, we cannot presume a new law was designed.
Still, however, it is urged that, unless some rule be laid down confining Tatom's survey in running as much north as south, first enterers will have it in their power to swallow up a country by keeping those of subsequent date off from their neighborhood until surveys shall be made; and therefore it would be unreasonable for Craig's claim to prevail against the plaintiff. In order to discover the unsoundness of this reasoning, we must trace it to its source. Here again we perceive a wrong assumption of premises, from which this supposed hardship on subsequent enterers is deduced. It is built on a supposition that the previous enterer and subsequent enterer are in all respects in œquali jure, or upon an equal footing. By our statutes, this is not the case, as it is by the Act of the Virginia legislature, in the year 1779, entitled "An act for establishing a land office, and ascertaining the terms and manner of granting waste and unappropriated land, the sixteenth section of which enacts that the party shall direct his location so specially and precisely as that others may be enabled with certainty to locate other warrants on the adjacent residuum."
In the laws of North Carolina, the oldest enterer is *Page 297 
declared to have a preference in obtaining a survey and grant; that is, the surveyor is directed to survey such entry before a younger one; and, in making the survey of the younger, he is directed to bound the survey on the lines of the older claim, and to avoid interferences. By making the first entry, the enterer is to have his grant without interferences from younger entries. Thus a legislative preference is given, and the parties are not in œquali jure; and subsequent enterers have no ground for the objections against the construction put on these acts. If there be any defect, it is in the laws, and not in the construction of them. This preference of the older over the younger enterer is expressly secured by statute, which, by a directory provision of the law, authorizes surveyors, in running out lands, to do it in squares or oblongs, unless bounded by older claims. Observing the restrictions prescribed by the legislature, these officers may run out claims in any manner, taking care to comply with the calls in the location. Such has been the construction put on the laws by proprietors, surveyors, and courts, as to the manner of surveying entries.
Upon a full view of the whole of the land laws of North Carolina, such a course seems obvious from the preferences given to prior enterers over those of subsequent date. In the execution of the general provision in relation to entries, the courts of Virginia and Kentucky have laid down certain restrictive rules for surveying entries of general description, thereby to avoid, on the one hand, the destruction of such entries, and, on the other, the difficulties and hardships arising to subsequent enterers. But there is a provision in the land laws of Virginia respecting pre-emptions parallel in principle with our statutes. This act provides that, "if any settlers shall desire to take up a greater quantity than is herein allowed them, they shall, on payment to the treasury of the consideration money required from other purchasers, be entitled to the pre-emption of any greater quantity of land, adjoining to that allowed them in consideration of settlement, not exceeding 1000 acres, and to which no other person hath any legal right or claim."
In this, as in our laws, we see a preference conferred on one class of people over those of another; and the decisions of the courts of Kentucky, in controversies growing out of this preference to pre-emptioners over entries on treasury warrants, demonstrate the correctness of the course of judicial determinations in the State courts of North Carolina and here. *Page 298 
The general principle of our land law is bottomed on preferences to older entries similar to those in favor of pre-emptioners found in the exception to the general principle in Virginia and Kentucky. Hughes, 117, 130-133; Hardin, 194-196. Previously to the Act of 1786, c. 20, relied on as requiring certainty in entries, the minds of men were settled as to the degree of certainty an entry should contain to give it validity; that act speaks of things as they then were, not as they should be, and makes no alteration in this respect, or in the mode of surveying entries. In order, therefore, to understand what is meant by a special entry under the laws of North Carolina, we must resort to the understanding of proprietors, surveyors, citizens, and courts, in the period immediately preceding the passage of the Act of 1786. It is not our own ideas of right or wrong that constitute law. It is only found in adhering to the settled opinions of judges who have preceded us.
If entries of the description of Tatom's, and surveyed in the manner that was, have (with but few exceptions) been considered sufficiently special for nearly forty years, it would be going too far in overturning settled rules of property for this Court to say that the contemporaneous construction of the land laws was wrong; that we will remove the ancient landmarks of the law, and leave society to fight their way through scenes of litigation in the establishment of new principles which must eventuate in great loss to individuals.
In support of the objections taken to former decisions of the courts of this State, in relation to the mode of surveying entries of general description, the decisions of the courts of Kentucky have been relied on.
These decisions, so far from supporting the precision contended for, clearly prove the correctness of the view taken by the Court in the principal case.
The positions assumed and points made in the case of Astods v.
Miller, Hardin, 193, are on the ground of preference to pre-emptioners. The principle is the same as in our laws, and therefore, in reading the case, we are only to apply the principles established by it, in favor of pre-emptioners when in contest with treasury-warrant claimants, to the case of older enterers in relation to those of younger date. After stating the case the Court proceeds, "whether the defendant's claim at the date of the location had lost the preference and superiority of pre-emption, but, if not, then,
"Secondly, whether it could be entered on land previously located upon a treasury warrant, near to and on one side of the settlement to which the pre-emption was appendant, *Page 299 
but leaving vacant land on the other side to satisfy the pre-emption. The first question was spoken to by the counsel for the complainant, in part, as though the time for entering preemption warrants had been suffered to expire before the date of the defendant's entry, and afterwards revived by the legislature of Virginia; whereas the time allowed by the Act of 1779 had been enlarged and continued from time to time without chasm, so that the argument on that branch of the cause can be predicated only on a supposed incompetency of the powers of that legislature to extend the time. That question the Court feel not the smallest hesitation in deciding affirmatively in favor of the powers of the legislature. As it respects the powers, the proper exercise of those powers, between the Commonwealth of Virginia and those to whom settlement and pre-emption rights were granted, it may be remarked that the situation of this district, remote from the capital, detached from the rest of Virginia by an extensive wilderness, infested by an Indian enemy, which rendered communication with the mother State very difficult and uncertain; the harassed and endangered state of this then infant settlement, whose very extermination was threatened by the savage foe, — called aloud upon the legislature to extend the time limited for obtaining pre-emption warrants, and entering them with the surveyor. As it respects the justice of the measure, with regard to the holders of treasury warrants, it may be remarked that they purchased their warrants subject to the reservations made in favor of pre-emptioners, for whom certain portions of land out of the general fund had been reserved sub modo, because of services rendered which the Act of 1779 recognized as a consideration in part.
"If the terms held out to pre-emptioners had not been complied with, the land reserved for them might have returned to the general mass; but the legislature have not chosen to insist rigidly upon those terms, so as to work a forfeiture, but have extended the time for performance. In doing this they have not diminished the fund out of which the holders of treasury warrants purchased; but only prevented the general fund from receiving an accession. The legislature have not encroached on the boundaries originally referred to, or transgressed the limits prescribed in the terms of sale to the purchaser of treasury warrants, but have acted only upon the reservations contained therein. These observations are not produced by any doubt as to the powers of the legislature, but are intended to show that a liberal construction should be given to their acts in favor and *Page 300 
in preservation of the rights of pre-emption. The Court is of opinion that the defendant's warrant, when located, had not lost its superiority and preference as a pre-emption. The nature and extent of that superiority belong to the second question. It has been contended that the right of pre-emption is satisfied by leaving vacant land on one side of the settlement; and such was the fact in this case. The impropriety of deciding upon the merits or demerits of claims, collaterally brought into view, and held by those who are not parties or privies, and therefore not bound by the decision, is a sufficient answer to so much as regards the fact of vacancy; which, however, is not suggested in the bill or otherwise affirmed by the complainant's counsel in argument. But if the vacancy were admitted, the right of pre-emption, as given by the law, excluded the idea of encroachment otherwise than as subject to the risk that the choice of the pre-emption right might alight on the same tract with that of the treasury-warrant claimant, and in such case the treasury warrant must yield.[1]
"The arguments used by the complainant's counsel tend rather to show that the legislature might have offered better terms to purchasers of treasury warrants, than to explain what are the rights of pre-emption actually reserved. Pre-emption, that is to say the right to buy in preference to others, was recognized in favor of a certain description of persons; the quantity of the particular tracts they should have the right to buy in preference to others was defined;[2] but the precise metes and bounds were left to be designated by the pre-emptioners in their future entries with the surveyor,[1] with this restriction, however, as to them, and as to notice to other purchasers, that the land should be adjoining to that allowed them in consideration of settlement.
"Such were the terms held out to pre-emptioners; and such were the reservations made known to purchasers of treasury warrants. The time allowed by law for entering pre-emption warrants extended originally, and before enlargement, beyond the period at which the location of treasury warrants was to commence. In this interval, between the opening of the land office and the original limitation, the *Page 301 
complainant's entry was made. So that purchasers of treasury rights generally, and the complainant in particular, acquired their rights subject to these terms of preference. He cannot, then, complain that he has been denied any benefit of selection which he purchased; but his complaint is, that he has not been permitted to take first choice, to the exclusion of those to whom he was informed at the time of his purchase the first choice belonged and was reserved. The inconvenience to holders of treasury warrants resulting from being compelled to leave considerable quantities of land around the settlement claims, or of appropriating the whole subject to the risk of being overreached as to 1000 acres by the pre-emption appendant,[2] were considerations proper to be weighed by the legislature, and by the individuals who purchased and located treasury warrants.[3] The Court can only say,ita lex scripta est. To give the right of pre-emption any other construction would involve endless absurdities, perplexities, and uncertainties, and would be contrary to the whole current of decisions, which have become settled rules of property.[4] It therefore seems to this court, that the right of the pre-emptioner was not to be curtailed or restricted to one or more sides of his settlement, by the act of treasury-warrant holders, in locating such warrant upon one side of the settlement, although all of the other sides might have been left vacant; but if he chose to approximate the settlement with his claim, he might do so, but at the peril of having his treasury right overreached by the pre-emption appendant to such settlement."
So, if the surveyor choose to survey a younger entry before an older one, it is at the peril of having the younger entry overreached by a survey on an older entry, made in any form, within the restrictions imposed on the surveyor by law, the Acts of Assembly having ever been considered, in that respect, as directory to surveyors; the older enterer, like the pre-emptioner, having the preference in the survey and grant, he cannot be deprived of the advantages these statutory preferences communicate by an act of the surveyor in surveying a younger entry first, or by any other act of third persons; as, the making of entries in the neighborhood, *Page 302 
the secretary issuing the first grant, c. Suppose there were no younger entry to contend with, the survey in an oblong form would be good. The intervention of a subsequent entry leaves the preference of survey and grant, given by statute to the first enterer, as completely unimpaired as if the second entry were made in another country.
If our acts were construed upon the general principles of the Virginia Act of 1779, instead of the principles of preference contemplated in Astods v. Miller; and courts should give, as in Kentucky, a construction to entries of general description by presumption, — all the benefits designed by the legislature of North Carolina to be given to older entries would be lost. The first enterer, so far from being on a better footing by having a statutory preference of the first survey and first grant, with a legislative provision that the lines of younger entries should not interfere, would in fact be in a worse predicament than the younger interfering claim, by reason of surveyors and others having formerly understood the Acts of Assembly differently. It was universally understood that the preference in the survey extended to the oblong form, c. Under these impressions, surveys for nearly forty years have been made; to apply a different rule now would not only be disregarding the preferences given by law, but enabling younger entries to overreach older ones, not by putting them on a footing of equality with them, but actually placing them on higher ground, as it would now enable them to hold lands from older enterers on grounds which, had they formerly existed, such older enterers would have avoided.
In fine, the statutory preferences to older enterers, by which all courts are bound, never can be rendered effectual, as the legislature designed, by any other construction than that which usage has sanctioned; without such a construction the legislative provisions directing that older enterers should obtain the first surveys and first grants would be annulled and rendered nugatory.
The judgment must be affirmed.
[1] Dr. Paley, a writer of deserved eminence, in his treatise on morals and politics, observes, in p. 383-4, 18th ed., "that deference to prior decisions is founded upon two reasons: first, that the discretion of judges may be bound down by positive rules; and secondly, that the subject (or citizen), upon every occasion in which his legal interest is concerned, may know beforehand how to act, and what to expect. To set judges free from any obligation to conform themselves to the decisions of their predecessors, would be to lay open a latitude of judging, with which no description of men can safely be intrusted. It would be to allow space for those concealed partialities, which, since they cannot by any human policy be excluded, ought to be confined by boundaries and landmarks. It is in vain to allege that the superintendency of parliament is always at hand to control and punish abuses of judicial discretion. By what rules can parliament proceed? How shall they pronounce a decision to be wrong, where there exists no acknowledged measure or standard of what is right, which in a multitude of instances would be the case, if prior determinations were no longer to be appealed to.
"Diminishing the danger of partiality is one thing gained by adhering to precedents; but not the principal thing. The subject of every system of laws must expect that decision in his own case, which he knows that others have received in cases similar to his. If he expects not this, he can expect nothing. There exists no other rule or principle of reasoning, by which he can foretell or even conjecture the event of a judicial contest. To remove, therefore, the grounds of this expectation, by rejecting the force and authority of precedent, is to entail upon the citizen the worst property of slavery; to have no assurance of his rights, or knowledge of his duty. The quiet also of the country, as well as the confidence and satisfaction of each man's mind, requires uniformity in judicial proceedings. Nothing quells a spirit of litigation like despair of success; therefore, nothing so completely puts an end to lawsuits as a rigid adherence to known rules of adjudication. Whilst the event is uncertain, which it ever must be whilst it is uncertain whether former determinations upon the same subject will be followed or not, lawsuits will be endless and innumerable; men will commonly engage in them, either from the hope of prevailing in their claims, which the smallest chance is sufficient to encourage, or with the design of intimidating their adversary with the terrors of a dubious litigation.
"When justice is rendered to the parties, only half the business of a court of justice is done; the more important part of its office remains; to put an end for the future to every fear, and quarrel, and expense, on the same point, and so to regulate its proceedings that not only a doubt once decided may be stirred no more, but that the whole train of lawsuits, which issue from one uncertainty, may die with the parent question. Now, this advantage can only be attained by considering each decision as a direction to succeeding judges. And it should be observed that every departure from former determinations, especially if they have been often repeated, or long submitted to, shakes the stability of all legal title. It is not fixing a point anew; it is leaving every thing unfixed. For by the same stretch of power by which the present race of judges take upon them to contradict the judgment of their predecessors, those who try the question next may set aside theirs."
The authority of this book is unquestionable in cases to which it applies. It is particularly recommended to lawyers by the celebrated Mr. Dunning, the most probable author of Junius's Letters. See 2 North Carolina Law Rep. 225; 2 Ketts, Elements, 2 vol. 42.
[1] In the same manner with younger entries in this country.
[2] A similar preference to first enterers, in having their surveys and grants first made, is defined by the legislature of North Carolina.
[1] In the same manner as the precise bounds of first enterers here, having a similar preference, is left to be designated by the surveyor.
[2] The risk of being overreached is the complaint of younger against older enterers in this country.
[3] So of subsequent enterers in this country.
[4] There is a close analogy between the reasoning employed in this sentence and the case before the court.